**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| **FINANCE EXPRESS LLC,** | **Case No.: SACV 07-01225-CJC(ANx)** |
| **Plaintiff,** | |
| **vs.** | |
| **NOWCOM CORPORATION, et al.** | **ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| **Defendants.** | |

**INTRODUCTION**

This motion for a preliminary injunction arises out of a trademark dispute between two competing companies, Finance Express LLC ("Finance Express") and Nowcom Corporation ("Nowcom"), both of which offer software to automate and facilitate financing for automobile dealers and lenders. Finance Express now requests that this Court preliminarily enjoin Defendants from engaging in various practices through the

internet that have allegedly caused Finance Express irreparable injury, jeopardizing its reputation and goodwill.  Specifically, Finance Express argues that Nowcom must be enjoined from registering infringing domain names, the practice of "keyword stuffing," (embedding Finance Express' trademarks in Nowcom's meta tags and HTML code), and the practice of "keying" (purchasing "keywords" containing Finance Express' trademarks from search engines such as Google in order to obtain banner advertisements that appear when those terms are searched).  The Court finds that Finance Express has made the requisite showing of a combination of probable success on the merits of its trademark infringement claim and the possibility of irreparable harm if Nowcom is not preliminarily enjoined from this infringing conduct.   In engaging in domain name registration of Finance Express' trademarked terms as well as the practices of "keying" and "keyword stuffing," Nowcom has gained an unearned advantage and has misappropriated Finance Express' goodwill.  Accordingly, these three practices must be enjoined.

**FACTUAL BACKGROUND**

Finance Express is in the business of providing software to automate and facilitate credit relationships between used automobile dealers and lenders.  First Amended Complaint ("FAC"), ¶ 15.  Finance Express is the owner of several trademarks at issue: Finance Express, DealTrace®[1], Tracker™, and Tracker DMS™.  FAC, ¶¶ 17, 19.

---

[1] Defendants argue that they were prejudiced by the fact that Finance Express' motion contains allegations regarding infringement of its trademark "DealTrace" as well as allegations regarding Defendants' practices of "keying" and "keyword stuffing" because those allegations were not included in the First Amended Complaint ("FAC").  Defendants have not shown that they were actually prejudiced by this omission.  Plaintiff asserts that it only learned of the infringement of DealTrace® as well as Defendants' practices of "keying" and "keyword stuffing" through discovery that occurred after the FAC was filed.  Courts generally give leave to amend the pleadings based on information obtained through discovery, in keeping with Federal Rule of Civil Procedure 15.  *See Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001).  Additionally, Defendants were put on notice of the allegations regarding "keying" and "keyword stuffing" through specific deposition questions and targeted discovery which took place in February and March, 2008.  (*See* Davis Decl, Exs. 2, 14.) Plaintiff's counsel asserted at the hearing on this motion that the parties also discussed these allegations

Finance Express owns and operates its business out of its main website, <financeexpress.com>, and uses the internet as a marketing channel for its primary product, Finance Express Dealer Management System, an internet-based technology platform that enables auto dealers to obtain financing for their inventory.  FAC, ¶ 16. Finance Express also offers a product known as the Tracker Dealer Management Software ("Tracker DMS") that it purchased from a competitor, Manheim Interactive, Inc ("Manheim") on May 7, 2007 (*Id.* at ¶ 4.)  The Tracker DMS product is a web-based dealer management database solution that allows automobile dealers to track their profitability, manage their inventory, conduct sales, and perform other services.  The Tracker™ software was owned and operated by Manheim and its predecessors for over ten years until Finance Express purchased it in 2007.  (*Id.* at ¶ 7.)  Following the acquisition, Finance Express expected to convert approximately 850 existing Tracker™ dealers to Finance Express' platform by the end of 2007.  (*Id.* at ¶ 5.)  However, Finance Express has only converted approximately 250 dealers at present.  (*Id.* at ¶ 8.)

Finance Express alleges that its failure to generate expected revenue after purchasing the Tracker DMS software from Manheim is directly attributable to trademark infringement and dilution, false advertising, and other illegal conduct by Defendants Nowcom Corporation, Rufus Hankey, Don Hankey, Westlake Services, Inc., Hankey Investment Company, and Hankey Group (collectively, "Nowcom").  (Huber Decl., ¶ 8.) Nowcom is a direct competitor of Finance Express, and offers its own dealer software solution called "Dealer Desktop."  FAC, ¶ 35.  Finance Express asserts that Defendants infringed on its marks by engaging in at least four different types of illegal conduct on the

---

during their meet-and-confer that took place prior to Plaintiff's filing of this motion.  When the Court asked Defendants' counsel how Defendants had been prejudiced by the failure to include these allegations in the operative complaint, he was unable to articulate any specific way in which Defendants had been prejudiced.  Moreover, if Defendants had truly been prejudiced by this omission, the Court would have expected them to file an *ex parte* application for an extension of time to oppose Plaintiff's motion, which they failed to do.  Instead, they fully addressed Plaintiff's allegations on the merits, indicating that they had adequate notice and an opportunity to respond.

internet: (1) Nowcom registered a series of domain names with the company Go Daddy which incorporated Finance Express' trademarks into the domain names (FAC, ¶ 46); (2) Nowcom linked at least two of the infringing domain names to a Nowcom website that contained a misleading "press release" encouraging clients of Finance Express to switch over to Nowcom (*Id.* at ¶¶ 49-52); (3) Nowcom engaged in "keyword stuffing" whereby it used Finance Express' marks in meta tags and buried HTML code in order to ensure that Nowcom's website will appear in the list of search engine results a user will find upon searching for Finance Express' products[2] (Pl.'s Mot. Prelim. Inj., p. 6); and (4) Nowcom used "keying" to ensure that users searching for Finance Express' products or services would see a banner advertisement for Nowcom along with the search results.[3] *Id.* Specifically, Nowcom purchased "keywords" from Google and other search engines that contained Finance Express' trademarks so that when internet users search for those terms, a banner advertisement for Nowcom will appear on the search results screen.[4] Finance Express alleges that this conduct constitutes trademark infringement, false advertising, and false designation of origin under the Lanham Act and that it also violates the Anticybersquatting Consumer Protection Act and various state laws.

---

[2] Nowcom's employees admitted in deposition testimony that they used the following terms as meta tags: "manheim dms," "manheim tracker," "tracker manheim," "finance express DMS," and "tracker DMS." (Davis Decl., Ex. 2, Guerra Tr. at 162:16-19.)  Defendants also used the term "DealTrace" as a meta tag.  (Huber Decl., ¶ 4.)

[3] "Keying" is a practice that allows advertisers to target individuals with certain interests by linking advertisements to pre-identified terms. *Playboy Enterprises, Inc. v. Netscape Communications Corp.*, 354 F.3d 1020, 1022 (9th Cir. 2004).  Google's AdWords program allows entities to purchase advertising space connected with specific words, known as "keywords."  Keywords are then used to drive internet users to the purchaser's website.  For example, when a user searching for "Finance Express" types that term into Google, this triggers the appearance of an advertisement for Nowcom under the heading "Sponsored Links."  (*See* Davis Decl., Ex. 11; Cirsch Decl., Ex. E.)  Nowcom purchased the keywords "Finance Express," "Finance Express Manheim Tracker," "Finance Express Tracker," "Manheim Tracker conversion," "Manheim Tracker," "Tracker DMS," and "Tracker migration."  (Davis Decl., Ex. 11.)

[4] Finance Express also argues that Nowcom has engaged in "reverse engineering." The Court will not address this contention because Finance Express has not provided any evidence in support of this assertion, aside from a conclusory reference in the declaration of Mr. Huber.

Prior to the time Finance Express filed this motion, Nowcom implemented an advertising campaign entitled "6 Reasons to Migrate," pursuant to which Nowcom used Finance Express' name and marks in order to divert current and potential customers of Finance Express to Defendants' competing product, Dealer Desktop. (*See* Davis Decl., Ex. 3.) One aspect of the campaign was to register domain names with Finance Express' trademarks contained within them. On May 31, 2008, Nowcom registered the following domain names: <trackerdmsonline.com>, <trackerconversions.com>, <trackerupgrade.com>, <tracker-dms.com>, <besttrackerconversion.com>, <newtracker-dms.com>, <financeexpressdms.com>, as well as several slightly modified versions of these domain names. (Davis Decl., Ex. 4.)

On June 19, 2007, Nowcom launched two websites using the domain names <trackerdmsonline.com> and <financeexpressdms.com>. These websites featured a "Press Release" which "announced" the fact that Finance Express had purchased Manheim's Tracker DMS and reported that auto dealers were dissatisfied with "the breaking news" because they were paying higher prices to Finance Express than they paid to Manheim. (Davis Decl., Ex. 6.) The Press Release encouraged Finance Express' customers to "seamlessly migrate" from Manheim Tracker DMS to Nowcom's Dealer Desktop. (*Id.*) Although Nowcom's logo appeared at the top of the webpage, the website gave the false impression that the "Press Release" was being jointly offered by Nowcom and Finance Express because it was found at a website that was confusingly similar to Finance Express' website (*compare* <financeexpress.com> and <financeexpressdms.com>) and because it contained headings such as "About Nowcom" and "About Finance Express". The section entitled "About Finance Express" contained a description of Finance Express' services and listed its correct website. The Press Release gave the erroneous impression that Finance Express and Nowcom were collaborating and had jointly decided to offer Nowcom's Dealer Desktop product as an alternative to Manheim Tracker DMS.

Finance Express first discovered the "Press Release" on Nowcom's website <trackerdmsonline.com> on October 5, 2007, and responded by sending a cease and desist letter to Rufus Hankey and Nowcom.  (Davis Decl., Ex. 4.)  The letter demanded that Nowcom remove the website and refrain from using Tracker or the TrackerDMS marks and the name of Finance Express in any way.  On that same day, only hours after receiving the cease and desist letter, Nowcom registered <nomoretracker.com>.  (Davis Decl., Ex. 7.)  On October 9, 2007, Nowcom emailed Finance Express and stated that it had removed the website in question, <trackerdmsonline.com>.  On October 26, 2007, Defendant Rufus Hankey emailed the president of Finance Express to "apologize if [his] aggressive marketing caused problems with [Finance Express]."  (Davis Decl., Ex. 1.)  Despite these representations, on December 14, 2007, Finance Express discovered that the "Press Release" was still available at another one of Defendants' websites, <financeexpressdms.com>.  (Davis Decl., Ex. 4.)  Nowcom's Chief Operating Officer, Robert Lekstrom, asserts that upon notification by Finance Express, Nowcom removed <financeexpressdms.com>.  (Cirsch Decl., Ex. C.)  Mr. Lekstrom avers that by December 18, 2007, Nowcom had voluntarily cancelled all the allegedly infringing domain names mentioned above.  (*Id.*)  Significantly, Nowcom does not dispute that it was responsible for registering the allegedly infringing domain names and linking them to the "Press Release"; instead, Nowcom argues that these acts do not constitute trademark infringement, cybersquatting, false advertising, or trade dilution.

Although Nowcom has apparently removed all of the infringing domain names, Nowcom continues to use Finance Express' name and trademarks in meta tags and through the practice of "keying."  (*See* Davis Decl., Exs. 2, 10, 11.)  Just as with the domain name allegations, Nowcom does not deny that it engages in keying and keyword stuffing of terms such as "Finance Express," "Tracker," and "TrackerDMS."  Nowcom

defends its practices by arguing that they are merely competitive advertising and therefore protected as a type of fair use.

**LEGAL STANDARD**

To obtain a preliminary injunction, the moving party must establish: (1) a combination of probable success on the merits and the possibility of irreparable injury if relief is not granted, or (2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in its favor.  *Brookfield Communications, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1046 (9th Cir. 1999).  "The two standards set forth above are actually not separate tests but are the 'outer reaches' of a single continuum; the greater the balance of hardships tips in favor of the moving party, the less likelihood of success on the merits must be shown."  *Apple Computer, Inc. v. Formula Int'l, Inc.*, 562 F. Supp. 775, 783 (C.D. Cal. 1983), *aff'd*, 725 F.2d 521 (9th Cir. 1984) (*citing Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1201 (9th Cir. 1980).

**ANALYSIS**

In order to be granted a preliminary injunction, Finance Express only needs to show the requisite combination of probable success on the merits and the possibility of irreparable injury with respect to any one of its claims.  Here, the Court finds that Finance Express has met its burden with respect to its trademark infringement claim, and therefore the Court need not address the other claims at this time.

## A. LIKELIHOOD OF SUCCESS

### 1. Validity of the Claimed Marks

In order to establish trademark infringement under section 32 of the Lanham Act, a plaintiff must demonstrate that the defendant is using a mark confusingly similar to a valid, protectable mark of the plaintiff. *See AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979). Section 32(1) of the Lanham Act provides that a person shall be liable for trademark infringement who "use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1). Accordingly, Finance Express must demonstrate that (1) its marks are protected; and (2) Nowcom used Finance Express' marks or a reproduction of those marks in commerce in a manner which is likely to cause confusion. With respect to the first prong, Finance Express has shown, for the purposes of a preliminary injunction, that its marks are valid and protected.

#### a. Priority of Use

The parties do not dispute that Finance Express is the senior user of the marks at issue. DealTrace™ was registered with the U.S. Patent Office on July 12, 2005. (Supp. Huber Decl., ¶ 3, Ex. A.) Finance Express purchased Tracker™ and TrackerDMS™ on May 7, 2008, and Manheim sold the Tracker software associated with those marks for almost a decade before the sale. Since the alleged infringement did not take place until May 31, 2008, Finance Express' use of the marks is senior to that of Nowcom.

#### b. DealTrace is a Suggestive Mark

There are five categories of trademarks: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful. *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk*

*Grove, Inc.*, 419 F.3d 925, 927 (9th Cir. 2005) (citation omitted).  "[S]uggestive, arbitrary, or fanciful [terms] are automatically entitled to trademark protection because they are inherently distinctive."  *Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.*, 149 F.3d 722, 727 (7th Cir. 1998).  Although "[m]arks which are merely descriptive of a product are not inherently distinctive," "[a] descriptive mark can receive trademark protection if it has acquired distinctiveness by establishing 'secondary meaning' in the marketplace."  *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).  A generic mark is not protected at all.  *Yellow Cab*, 419 F.3d at 927.

When a mark is registered, it is afforded a presumption of ownership and validity pursuant to 15 U.S.C. § 1057(b).  Here, Finance Express registered the mark DealTrace™ with the U.S. Patent Office on July 12, 2005.  Accordingly, it is presumed to be valid, and Nowcom has not offered any evidence to rebut the presumption of validity.  Additionally, the Court finds that the term "DealTrace" is suggestive because it "requires a mental leap from the mark to the product."  *Brookfield Commc'ns., Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1058 (9th Cir. 1999).  "If the mental leap between the word and the product's attribute is not almost instantaneous, this strongly indicates suggestiveness, not direct descriptiveness."  *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 911 (9th Cir. 1995) (*citing* 1 McCarthy § 11.21 at 11-108, 109).   If a consumer must use imagination or any type of multistage reasoning to understand the mark's significance, then the mark does not describe the product's features, but suggests them.  *Kendall-Jackson Winery v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 n.8 (9th Cir. 1998).

Here, "DealTrace" is a software application that allows automobile dealers to manage various transactions.  Although the term "DealTrace" is suggestive of its purpose – to trace deals – it is not immediately apparent what product is at issue or to whom the product is directed.  Similarly, the term "Air Care" was found to be a suggestive mark for

a service that maintains medical equipment used for administering oxygen because a consumer must use some imagination to understand the significance of the mark.  *Airco, Inc. v. Air Prods. & Chemicals, Inc.*, 196 U.S.P.Q. 832 (TTAB 1977).   Because there is a mental leap between the concept of tracing deals and the fact that this is a software service intended to aid automobile dealers contracting with lenders, "DealTrace" is a suggestive mark.

### c.  Tracker, TrackerDMS, and Finance Express are Descriptive Marks with Secondary Meaning

A mark is descriptive if it conveys some knowledge of the characteristics of the product or service.  *In re MBNA America Bank, N.A.*, 340 F.3d 1328, 1332 (Fed. Cir. 2003).  "A descriptive mark . . . is one that merely describes the ingredients, qualities, or characteristics of an article of trade or a service."  *Mil-Mar Shoe Co., Inc. v. Shonac Corp.*, 75 F.3d 1153, 1157 (9th Cir. 1996).  "Thus, 'Honey Baked Ham' is a descriptive term for a ham that has been baked with honey, and 'Honey Roast' is a descriptive term for nuts that have been roasted with honey."  *Kendall-Jackson Winer*, 150 F.3d at 1047 n.8. (citations omitted).  These two marks are descriptive rather than suggestive because they do not require the consumer to use imagination or "multistage reasoning" to understand the mark's significance.  *Id.*  The term "Tracker" is descriptive of its service, which is to track automobile dealers' inventory and sales.  This conclusion is bolstered by the fact that hundreds of other companies have used the phrase "Tracker" to identify their software products, including within the automobile industry.  (*See* Cirsch Decl., Ex. J.)  "TrackerDMS" is also descriptive because "DMS" is merely an acronym for "Dealer Management Software," which clearly describes Finance Express' product.  When two descriptive terms are combined, the question of whether the combined mark is descriptive or suggestive depends on whether the combination of terms evokes a new and unique commercial impression.  *In re Oppedahl & Laron LLP*, 373 F. 3d 1171, 1176-77 (Fed. Cir. 2004).  If each component retains its descriptive significance in relation to the

services at issue, the combination results in a composite that is itself descriptive. *Id.* Here, merely combining "Tracker" with an acronym that accurately and thoroughly describes the product at issue does not evoke a new and unique commercial impression. Therefore, "TrackerDMS" is also descriptive.

The Court also finds the mark "Finance Express" to be descriptive. The Trademark Trial and Appeal Board held that "Express" is merely descriptive of banking and trust services. *See In re Wells Fargo & Co.*, 231 U.S.P.Q. (BNA) 95, 1986 TTAB LEXIS, at *5-6 (TTAB 1986) (holding "EXPRESSSERVICE" was merely descriptive of banking and trust services). The board noted that the term "express" conveyed to consumers that the services would be fast. *Id.* at *5. With respect to the term "finance," it is significant that Finance Express' trademark application for this term expressly disclaimed any exclusive right to use "finance" apart from "express." (Cirsch Decl., Ex. D.) When combined, the term "Finance Express" conveys to consumers that they will be able to receive financial services in an expedited manner. Because a consumer need not engage in any multistage reasoning or use any imagination to understand the significance of the service or goods, the mark is merely descriptive.

Although "Tracker," "TrackerDMS" and "Finance Express" are descriptive marks, the Court nonetheless finds that they are protected because Finance Express has demonstrated that they have secondary meaning. "Secondary meaning" is a mental recognition in buyers' and potential buyers' minds that products connected with the symbol or device originate from or are associated with the same source. *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 81 (9th Cir. 1980). Generally, secondary meaning is proven through evidence related to the amount and manner of advertising of the mark, sales volume, consumer testimony, whether use of the mark was exclusive, and consumer surveys. *Yellow Cab*, 419 F.3d at 929; *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 840 (9th Cir. 2001). However, the Ninth Circuit has held on

numerous occasions that "evidence of deliberate copying is relevant to a determination of secondary meaning." *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 844 (9th Cir. 1987); *see also Auto Fidelity, Inc. v. High Fidelity Recordings, Inc.*, 283 F.2d 551, 557-58 (9th Cir. 1960); *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1016 (9th Cir. 1985); *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001).  In *Auto Fidelity*, the court held that secondary meaning could be shown when there is uncontested evidence of deliberate copying.  Applying California law, the court reversed the trial court for failing to find secondary meaning when there was "uncontradicted testimony, completely satisfactory to the trial court, that there had been an actual copying" and it was clear that the copier intended to confuse the consumer into believing he purchased the original article.  283 F. 2d at 557, 558.  The court echoed this sentiment in *Transgo*, stating "[p]roof of exact copying, without any opposing proof, can be sufficient to establish a secondary meaning."  768 F.2d at 1016.

In *Fuddruckers,* however, the Ninth Circuit clarified that evidence of deliberate copying does not shift the burden of proof to the defendant on the issue of secondary meaning.  826 F.2d at 844.  The *Fuddruckers* court also characterized the quoted language from *Transgo* as dicta, since there was independent evidence of secondary meaning introduced in that case.  *Id.*  The court left open the possibility that, "in appropriate circumstances, deliberate copying may suffice to support an inference of secondary meaning."  *Id. (citing Transgo*, 768 F.2d at 1015-1016); *see also Clicks*, 251 F.3d at 1264.  The question for this Court, therefore, is what constitutes "appropriate circumstances" to find that deliberate copying supports a finding of secondary meaning. In dealing with this identical question, a court within this circuit held that "it is only appropriate to draw an inference of secondary meaning from intentional copying where the circumstances of the case indicate that the copier, in addition to intending to copy, intended to deceive or confuse the public."  *Chrysler Corp. v. Vanzant*, 44 F. Supp. 2d 1062, 1081 (C.D. Cal. 1999).  The Ninth Circuit implicitly supported this analysis in

*Fuddruckers*, when it stated that copying could not support a finding of secondary meaning if the defendant copied the plaintiff's design to benefit from some intrinsic quality in the design, as opposed to copying with the purpose of confusing consumers into believing they were purchasing the plaintiff's product instead of the defendant's product.  The court held:

> We decline to so hold [that evidence of deliberate copying shifts the burden of proof on the issue of secondary meaning].  Competitors may intentionally copy product features for a variety of reasons.  They may, for example, choose to copy wholly functional features that they perceive as lacking any secondary meaning because of those features' intrinsic economic benefits.

826 F.2d at 844-45.  Several other circuits have concurred in this analysis.  *See Thomas & Betts v. Panduit Corp*, 65 F.3d 654, 663 (7th Cir. 1995) ("Copying is only evidence of secondary meaning if the defendant's intent in copying is to confuse customers and pass of his product as plaintiff's."); *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 716 F.2d 854, 859-60 (11th Cir. 1983) (holding that proof of intentional copying, in the absence of additional evidence of actual deception, does not "eliminate[] the need for proof of secondary meaning.")

   Here, it is undisputed that Nowcom engaged in deliberate copying by registering domain names containing Finance Express' marks and name, by purchasing keywords from search engines that contained Finance Express' name and marks, and by embedding Finance Express' name and marks in the HTML code of Nowcom's website.  The key question for a finding of secondary meaning is, "why did Nowcom engage in this copying?"  Did it copy in order to benefit from functional features of Finance Express' trademarks, or, rather, to confuse the public?  The Court finds that this situation clearly falls into the latter category.  Registering domain names that contain a competitor's marks is not akin to designing a product that incorporates the physical or design features of one's competitor.  Instead, the only purpose Nowcom could have had in registering

Finance Express' domain name was to direct potential consumers of Finance Express' products to Nowcom's website.  Likewise, the practices of keying and keyword stuffing were not carried out to benefit from the design of Finance Express' Tracker or TrackerDMS marks, but to direct consumers searching for Tracker software to Nowcom's website, either through the search results list or through Nowcom's banner advertisements.  Defendants admitted as much in their deposition testimony, when Rufus Hankey was asked the following regarding his registration of Finance Express' marks within eight different domain names:

> Q. [When] Finance Express DMS came up, were you concerned that some people may think that was the real finance express company?
>
> A.  I was just hoping for a hit.
>
> Q.  Was there any other use or reason for Nowcom to register all these domain names I went through earlier in the day other than to get a high ranking in Google's hierarchy?
>
> A.  Not to my knowledge.
>
> Q.  That was the sole purpose behind those?
>
> A.  Yes.

(Deposition Transcript of Rufus Hankey at 65:1-10; 73:13-19).  As will be explained more fully in section C, *infra*, Nowcom engaged in deliberate copying in order to cause "initial interest confusion" among consumers who were seeking out Finance Express' Tracker DMS products.  Nowcom engaged in deliberate copying not to benefit from some intrinsic aspect of Finance Express' marks, but rather to confuse consumers into believing they were perusing Finance Express' website instead of Nowcom's site.  These are exactly the type of circumstances anticipated in *Fuddruckers* in which it is appropriate for the Court to conclude that deliberate copying suffices to support an

inference of secondary meaning.  Therefore, the marks Tracker™, TrackerDMS™, and FinanceExpress™ are valid and entitled to protection under the Lanham Act.[5]

### 2. Nowcom Used Finance Express' Marks "In Commerce"

The Lanham Act defines "use in commerce" as "the bona fide use of a mark in the ordinary course of trade," specifically:

> (1) on goods when—
>  a.  [the mark] is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and
>  b.  The goods are sold or transported in commerce, and
> (2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

15 U.S.C. § 1127.  The Supreme Court has held that the "in commerce" requirement should be construed liberally because the Lanham Act "confers broad jurisdictional powers upon the courts of the United States."  *Steele v. Bulova Watch Co.*, 344 U.S. 280, 283 (1952).  Although the Ninth Circuit has not directly addressed the question of whether internet activity such as registering domain names, keying, or keyword stuffing constitutes "use in commerce" within the meaning of the Lanham Act, the court presumed without deciding that such activity met the standard in two recent cases.  *See Brookfield*, 174 F.3d at 1053 (finding that the plaintiff was entitled to a preliminary injunction with respect to infringing domain name registration and keyword stuffing because the plaintiff had shown the marks were protected and that there was a likelihood of confusion, without addressing the "use in commerce" requirement); *Playboy Enter.,*

---

[5] The Court notes that its determination regarding the validity of Plaintiff's marks is only a finding for the purposes of a motion for a preliminary injunction.  At trial, the jury will make the final determination regarding whether these marks are truly valid and protected under federal trademark law.

*Inc., v. Netscape Commc'ns Corp.*, 345 F.3d 1020, 1024 (9th Cir. 2004) (*"Playboy"*) (noting that there was no dispute that the plaintiff held the marks in question and that defendant had used the marks in commerce by engaging in the practice of keying). Although the *Playboy* court did not specifically define "use in commerce" in this context, it is significant that the court acknowledged the broad reach of the Commerce Clause in trademark cases, stating, "[f]ederal jurisdiction over trademark cases rests on the Commerce Clause, sweeps as broadly as possible, and clearly encompasses the circumstances of this case." *Id.* at 1024 n. 11.

Certain other federal courts to address this issue have also concluded that the practice of "keying" meets the "use in commerce" requirement for trademark infringement. *See Edina Reality, Inc. v. TheMLSonline.com*, 2006 WL 737064 *3 (D. Minn. March 20, 2006) ("While [keyword purchasing is] not a conventional 'use in commerce,' defendant nevertheless uses the . . . mark commercially.  Defendant purchases search terms that include the . . . mark to generate its sponsored link advertisement.  Based on the plain meaning of the Lanham Act the purchase of search terms is a use in commerce."); *Buying For The Home, LLC v. Humble Abode, LLC*, 459 F. Supp. 2d 310, 323 (D. N.J. 2006) ("First, the alleged purchase of the keyword was a commercial transaction that occurred 'in commerce.'  Second, Defendants' alleged use was both 'in commerce' and 'in connection with any goods or services' in that Plaintiff's mark was allegedly used to trigger commercial advertising which included a link to Defendants' furniture retailing website.")  The Court agrees with the logic of cases like *Edina Realty* and *Humble Abode* in their conclusion that purchasing keywords containing a plaintiff's trademarks constitutes a "use in commerce" under the plain meaning of the Lanham Act.  Here, Nowcom engaged in numerous commercial transactions using Finance Express' trademarked terms: (1) Nowcom purchased eight different domain names that included Finance Express' name and trademarks to drive Finance Express' potential consumers to Nowcom's website; (2) Nowcom purchased various keywords

containing Finance Express' marks from Google to ensure that users would view Nowcom's banner advertisement, again driving Finance Express' consumers to Nowcom's site.  Thus, Nowcom actually used Finance Express' trademarks to engage in two levels of commercial transactions; first, Nowcom used the marks to purchase advertising from third parties that was directed at Finance Express' potential users, and second, Nowcom profited from Finance Express' marks when it transacted with internet users who were initially searching for Finance Express' products but ultimately purchased Nowcom's products.

Similarly, Nowcom's practice of embedding Finance Express' marks in Nowcom's HTML code to ensure that Nowcom will appear higher on a list of search results for Finance Express' products also constitutes "use in commerce" of Plaintiff's marks. Through all three of these web-based practices, Nowcom used Finance Express marks to increase the likelihood of engaging in commercial transactions with Finance Express' potential consumers.  As such, Nowcom engaged in "the bona fide use of a mark in the ordinary course of trade."

### 3. Likelihood of Confusion

In order to show that it is entitled to a preliminary injunction, Finance Express must also establish that it is likely to be able to show a likelihood of confusion. "[L]ikelihood of confusion is the central element of trademark infringement."  The Ninth Circuit employs an eight-factor test, originally set forth in *AMF Inc. v. Sleekcraft Boats*, to determine the likelihood of confusion.  The eight factors are: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product line.  599 F.2d 341, 348-49 (9th Cir. 1979).  "In the internet context, courts must be flexible in applying the factors, as some may not

apply.  Moreover, some factors are more important than others."  *Playboy*, 354 F.3d at 1026.  "In the context of the web in particular, the three most important . . . factors are (1) the similarity of the marks; (2) the relatedness of the goods or services; and (3) the simultaneous use of the Web as a marketing channel."  *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000).   Applying these three factors here, Finance Express has shown that Nowcom's practices of domain name registration of Finance Express' marks, keyword stuffing and keying creates a likelihood of confusion.

### a.  Domain Name Registration of Plaintiff's Marks

Turning to the three most important *Sleekcraft* factors in the internet context, the Court begins by comparing the allegedly infringing mark to the protected marks.  "The similarity of the marks will always be an important factor.  Where the two marks are entirely dissimilar, there is no likelihood of confusion. . . [T]he more similar the marks in terms of appearance, sound, and meaning, the greater the likelihood of confusion."  *Brookfield*, 174 F.3d at 1054.  In the context of domain name registration of a plaintiff's marks, the court compares the allegedly infringing domain name with the claimant's trademark, not with the claimant's own domain name.  *Id.* at 1055.  Here, the correct comparison is between Finance Express' protected marks (Finance Express™, Tracker™, and Tracker DMS™) with the domain names registered by Nowcom (<trackerdmsonline.com>, <trackerconversions.com>, <trackerupgrade.com>, <tracker-dms.com>, <besttrackerconversion.com>, <newtracker-dms.com, and <financeexpressdms.com>).  There is no question that "Finance Express" is strikingly similar to "financeexpressdms," and that "Tracker DMS" is almost identical to "tracker-dms" and very similar to "trackerdmsonline.com."  The differences between Finance Express' marks and Nowcom's domain names are inconsequential in light of the fact that Web addresses are not caps-sensitive and that the ".com" top-level domain signifies the site's commercial nature.  *Id.*  Additionally, the various modifications of "tracker" employed by Nowcom (such as "trackerupgrade.com," "trackerconversions.com,"), while

not as similar to the Tracker mark as the previously discussed domain names, are still alike enough for the Court to conclude that this first factor weighs in favor of Finance Express.

With respect to the next important factor, the relatedness of the products and services offered, this factor too weighs in favor of Finance Express. "Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods." *Id. (citing Sleekcraft*, 599 F.2d at 350). In light of the striking similarity of the marks, if they were used with identical products or services, likelihood of confusion would follow as a matter of course. *See Lindy Pen Co. v. Bic Pen Corp.,* 796 F.2d 254, 256-57 (9th Cir. 1986). Here, it is undisputed that the parties are direct competitors in the automotive finance technology industry. (*See* Davis Decl., Ex. 17 (Nowcom's Answer) at ¶ 29; Ex. 18 (Rufus Hankey's Answer) at ¶ 29.) Finance Express' DMS internet-based platform and dealer management software enables dealers to obtain financing for their inventory. Nowcom's Dealer Desktop product is also a dealer management software which includes a dealer inventory tracking function. Opp'n, p. 6. Moreover, the relatedness of the products is evidenced by the fact that Nowcom admits to pursuing the exact same clients as Finance Express – used car dealers seeking to automate relationships with their lenders. The fact that Finance Express' products are only offered subject to a periodic fee, while Nowcom's products are offered as a one-time sale, is not a material difference between the two products. *See GoTo.com*, 202 F.3d at 1207 (competing internet search engines sufficiently similar products to create a likelihood of confusion).

Third, Finance Express and Nowcom are engaged in the simultaneous use of the internet as a marketing channel, "a factor that courts have consistently recognized as exacerbating the likelihood of confusion." *Brookfield,* 174 F.3d at 1057 (citations omitted).

Given the striking similarity between the domain names registered by Nowcom and Finance Express' marks, the relatedness of the products and services accompanied by those marks, and the parties' simultaneous use of the Web as a marketing and advertising tool, there was a significant likelihood of consumer confusion when users searching for "financeexpress" were directed to Nowcom's website <financeexpressdms.com>. Specifically, Nowcom caused a type of consumer confusion known as "initial interest confusion," which is actionable under the Lanham Act.  *Brookfield*, 174 F.3d at 1063. "Initial interest confusion" is defined as "consumer confusion that creates initial interest in a competitor's product.  Although dispelled before an actual sale occurs, initial interest confusion impermissibly capitalizes on the goodwill associated with a mark and is therefore actionable trademark infringement."  *Playboy*, 354 F.3d at 1025 (*citing Brookfield,* 174 F.3d at 1062-53). When consumers searched for Finance Express' website or products, they were unknowingly driven to Nowcom's "Press Release," which "announced" the fact that Finance Express had purchased Manheim's Tracker DMS and reported that auto dealers were dissatisfied with "the breaking news" because they were paying higher prices to Finance Express than they paid to Manheim.  The Press Release encouraged Finance Express' customers to "seamlessly migrate" from Manheim Tracker DMS to Nowcom's Dealer Desktop.  Although Nowcom's logo appeared at the top of the webpage, the website gave the false impression that the "Press Release" was being jointly offered by Nowcom and Finance Express because it was found at a website that was confusingly similar to Finance Express' website and because it contained headings such as "About Nowcom" and "About Finance Express".  Even if consumers were ultimately able to discern that they were purchasing Nowcom's products rather than those of Finance Express, Nowcom's infringing domain name registration created initial interest confusion which impermissibly capitalized on Finance Express' goodwill.

.

**b. Keyword Stuffing**

Finance Express has also met its burden of showing a likelihood of confusion with respect to Nowcom's practice of "keyword stuffing," or embedding Finance Express' marks in the HTML code and meta tags of Nowcom's website.  In *Brookfield,* the Ninth Circuit addressed the issue of whether using a plaintiff's marks in meta tags creates a likelihood of confusion sufficient to constitute trademark infringement.  As a preliminary matter, the court noted that trademark infringement claims relying on meta tag usage are "not . . . standard trademark case[s] and do[] not lend [themselves] to the systematic application of the eight [*Sleekcraft*] factors."  174 F.3d at 1062 n. 24.  Therefore, the court did not attempt to fit its discussion into one of the *Sleekcraft* factors.  *Id.*  The court noted although that the use of protected marks in meta tags does not create as much confusion as when protected marks are used in domain names, it may still "result in what is known as initial interest confusion." *Id.* at 1062.  The court explained that meta tags allow web surfers who are looking for plaintiff's products to be taken by a search engine to defendant's website.  Once there, web surfers will find a product similar enough to the plaintiff's that a sizable number of them who were looking for the plaintiff's product will simply decide to use the defendant's product instead.  *Id.*  "Although there is not source confusion in the sense that consumers know they are patronizing [defendant] rather than [plaintiff], there is nevertheless initial interest confusion in the sense that, by using [plaintiff's marks] to divert people looking for [plaintiff's product] to its website, [Defendant] improperly benefits from the goodwill that [plaintiff] developed in its mark." *Id.*  The Ninth Circuit ultimately concluded that the Lanham Act barred the defendant from including in its meta tags any term confusingly similar with the plaintiff's mark, and therefore reversed the lower court's denial of preliminary injunction to the appellant on this ground.  *Id.* at 1065.

Here, there is no question that Nowcom has used terms in meta tags and within its HTML code which are confusingly similar to Finance Express' protected marks.  While

Nowcom does not dispute these allegations, it argues that its conduct is protected as "fair use" of Finance Express' marks, relying on language to that effect in *Brookfield*. While it is true that the *Brookfield* court stated that it was not in any way restricting a defendant's right to use terms in a manner that would constitute fair use under the Lanham Act (174 F.3d at 1065), Nowcom's use of meta tags does not fall into this protected category. The *Brookfield* court distinguished the fair use case *Playboy Enters. v. Welles* ("*Welles*"), where Playboy sought to enjoin former Playmate of the Year Terri Welles from using "Playboy" or "Playmate" on her website. 7 F. Supp. 2d 1098, 1100 (S.D. Cal. 1998). Welles' website advertised the fact that she was a former Playmate of the Year, but minimized the use of Playboy's marks and contained numerous disclaimers stating that her site was neither endorsed by nor affiliated with Playboy. *Id.* The district court held that Welles was using "Playboy" and "Playmate" not as trademarks, but as descriptive terms fairly and accurately describing her webpage, and that her use of "Playboy" as a meta tag was a good faith attempt to index the content of her site. *Id.* at 1103-04. In the instant case, Nowcom's use of Finance Express' marks as meta tags is much more in line with the conduct of the defendant in *Brookfield* than the defendant in *Welles*. Nowcom is not using the terms "manheim dms," "manheim tracker," "tracker manheim," "finance express DMS," and "tracker DMS" as descriptive terms to fairly and accurately describe its webpage. Nowcom does not sell Tracker, TrackerDMS, or any product formerly owned by Manheim; it sells Dealer Desktop. Therefore, its use of those terms cannot be characterized as "descriptive," unlike Welles' use of the trademark "Playmate." Moreover, Nowcom made no attempt to minimize the use of Finance Express' marks and its site contains no disclaimers stating that Nowcom is neither endorsed by nor affiliated with Finance Express. Because Nowcom's use of Finance Express' marks in meta tags is intended to confuse consumers and to capitalize from Finance Express' goodwill rather than to accurately describe Nowcom's products, it is not a "fair use" under the Lanham Act.

### c. Keying

Finally, the Court finds that Finance Express has established a likelihood of confusion with respect to its allegations regarding Nowcom's practice of "keying," or purchasing keywords containing Finance Express' marks to ensure that web users searching for those terms will be exposed to Nowcom's banner advertisement.  In *Playboy*, the court addressed the issue of whether the plaintiff had established that the defendant's practice of keying demonstrated a likelihood of confusion sufficient to withstand summary judgment.  The court applied the *Sleekcraft* factors and determined that the Plaintiff had established there was a genuine issue of fact as to whether the defendant's keying and related use of banner advertisements caused initial interest confusion.  354 F.3d at 1029.  The court then addressed the defendant's fair use defense and concluded that having concluded that a genuine issue of fact existed regarding likelihood of confusion, the defendant could not establish fair use, since "[a] fair use may not be a confusing one."  *Id.*

Applying the three most relevant *Sleekcraft* factors to Nowcom's "keying" activity, they once again favor Plaintiff.  Nowcom has purchased keywords which are identical or strikingly similar to the trademarks held by Finance Express, it offers services and products which are highly related to those offered by Finance Express, and both parties engage in simultaneous use of the Web as a marketing channel.[6]  Just as with the keyword stuffing, the practice of keying may initially confuse consumers into clicking on Nowcom's banner advertisement.  Once the consumer arrives at Nowcom's site, he may realize he is not at a Finance Express-sponsored site.  However, he may be content to

---

[6] The other *Sleekcraft* factors also generally favor Finance Express: its marks are not weak or generic; the relevant "goods" are the links to the websites being sought and the goods available at those sites, and the parties' goods are in extremely close proximity since Nowcom's banner ad appears next to Finance Express' website; the degree of consumer care factor is neutral since the parties presented no evidence in this area; Nowcom's intent in selecting the mark was to initially confuse consumers into clicking on its ad; and the likelihood of expansion of product lines factor is irrelevant, since the products at issue are related.  *See Playboy,* 354 F3d at 1029.

remain on Nowcom's site, allowing Nowcom to misappropriate Finance Express' goodwill.  *Id.* at 1025.  "Such use is actionable."  *Id.* at 1026.

Nowcom attempts to distinguish *Playboy* from the instant case on the grounds that the banner advertisements in *Playboy* were unlabeled, and the court made note of this fact by stating that it was not "addressing a situation in which a banner advertisement clearly identifies it source with its sponsor's name. . . Doing so might eliminate the likelihood of initial interest confusion that exists in this case."  354 F.3d at 1030 & n. 44.  While it is true that a clearly-labeled banner advertisement might not create initial interest confusion, Nowcom's banner advertisement cannot be fairly characterized as one which "clearly identifies its source with its sponsor's name."  Nowcom's banner advertisement states in large, underlined font: "Manage Your Dealership."  Underneath that heading, on the second and third lines of the advertisement, it states in smaller font "Use Just One Software Program. Get A Free Trial of Dealer Desktop."  On the fourth line down, in even smaller font, appears a link to Nowcom's website: "www.Nowcom.com."  (*See* Cirsch Decl., Ex. F.)  This advertisement is not clearly labeled.  The only indication as to the identity of the advertisement's sponsor lies in the website address, which is located in small print on the last line of the advertisement.  While Nowcom's argument might be tenable if its name appeared in large font in the first line of the advertisement, or perhaps even if it appeared anywhere in the text of the advertisement, this is not the case.  A website address located in small font at the bottom of the advertisement is not sufficient to overcome the initial interest confusion that results from Nowcom's practice of keying.

In addition to its fair use defense, Nowcom also argues that Finance Express is not entitled to a preliminary injunction because it cannot point to any continuing harm, since Nowcom removed the infringing domain names and the objectionable "Press Release."  First, this argument is misplaced because it ignores the fact that Nowcom continues to engage in trademark infringement via its practices of keyword stuffing and keying.

Second, the Court finds that it may consider past conduct on a motion for a preliminary injunction if the plaintiff can demonstrate *either* continuing harm or a threat of repeated injury in the future. *See Imagineering, Inc. v. Kiewit Pacific County*, 976 F.2d 1303 (9th Cir. 1992) (denying the plaintiffs' prayer for injunctive relief because the complaint failed to allege that the "plaintiffs would suffer the same purported injury in the future.") Here, Finance Express has shown both. *See* Section B, *infra*.

Simply stated, Finance Express had demonstrated a strong likelihood of success on the merits of its trademark infringement claim by establishing that its marks are protected and that Nowcom used its marks or colorable imitations of its marks in commerce in a manner that is likely to cause consumer confusion. Finance Express has shown that it is likely to succeed on its trademark claim not only by relying on past conduct (the domain name infringement) but also due to Nowcom's ongoing infringement in the form of "keying" and "keyword stuffing."

**B. IRREPARABLE INJURY**

Finance Express has met the other requirement for preliminary injunctive relief, irreparable injury, for two reasons. First, irreparable injury may be presumed from a showing of likelihood of success on the merits of a trademark infringement claim. *See Metro Publ'g, Ltd. V. San Jose Mercury News*, 987 F.2d 637, 640 (9th Cir. 1993). Second, Nowcom has engaged in a pattern of conduct that provides good cause for the Court to find that Nowcom will continue to infringe on Finance Express' protected marks unless Nowcom is preliminarily enjoined. Despite the fact that Finance Express sent a cease and desist letter to Nowcom back in October, 2007, and despite Nowcom's assurances shortly thereafter that it would remove all infringing websites at that time, the infringing websites were not completely removed until mid-December, 2007, after Finance Express filed its complaint. Although it appears that Nowcom has not registered

any more infringing domain names since that time, its infringing activity has not stopped. Instead, it has merely morphed into other conduct such as "keying" and "keyword stuffing." The common thread throughout all of this conduct is that Nowcom continues to misappropriate and profit from Finance Express' goodwill, albeit in different forms. Finance Express has demonstrated that this conduct will probably cause irreparable injury to Finance Express' trademarks and reputation, if preliminary relief is not granted.

**CONCLUSION**

Accordingly, the Court will enjoin Nowcom from engaging in the following conduct: (1) registering, maintaining the registration of, operating, owning, promoting, advertising, marketing, and/or utilizing any website whose domain name and/or content utilizes any of Finance Express' marks, including Tracker, TrackerDMS, DealTrace, and Finance Express; (2) using any of these four marks or combinations of these marks as meta tags or in buried HTML code; (3) purchasing "keywords" containing these four marks or combinations of these marks to drive internet traffic to banner advertisements for Defendants. The Court will not require Defendants to issue a curative admission on its main website. The Court also will not at this time order Defendants to cease any efforts at reverse engineering, given the lack of evidence in support of this allegation.

Finance Express is hereby ordered to submit a proposed preliminary injunction, consistent with this order. In accordance with Federal Rule of Civil Procedure 65(c), which provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and

damages sustained by any party found to have been wrongfully enjoined or restrained," the proposed injunction must require that Finance Express post an adequate security.[7]

DATED:    June 18, 2008

_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE

---

[7] Finance Express is also instructed to submit a second amended complaint within twenty days of this order that incorporates its new allegations regarding its trademark DealTrace® as well as allegations regarding Nowcom's practices of "keying" and "keyword stuffing."